IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION


ALDIJANA MILJKOVIC,              )
                                        )
             Plaintiff,        )
                                         )
            v.             )     No. 11 C 6775
UNIVERSITY ANESTHESIOLOGISTS,  )
S.C., an Illinois corporation,      )
                                         )
            Defendant.    )


# OPINION AND ORDER


       Plaintiff Aldijana Miljkovic worked as a medical assistant for defendant

University Anesthesiologists, S.C. ("UA") from June 2008 until September 2009

when she was fired for not promptly and properly reporting that a vial of Demerol

was missing from the locked narcotics cabinet.  Defendant UA claims the decision

was based not only on this incident, but also on plaintiff's earlier performance

problems in February 2009 when she was placed on three-month probation.

       Plaintiff believes discrimination motivated the decision.  She alleges that

Renata Lukenda, her immediate supervisor, and her second-level supervisor,

Dr. Olga Ivankovich, falsely accused her of wrongdoing to get her fired because

they were Croatians and Christians who disliked plaintiff's national origin (Bosnian) and religion (Muslim). Plaintiff alleges that they created a hostile environment by making comments critical of Bosnians and Muslims. She also alleges that, in October 2008, defendant failed to accommodate her request to take off work for the Muslim holiday of Ramadan.

The court has jurisdiction of the parties and the subject matter. 42 U.S.C. §§ 2000e *et seq.* and 28 U.S.C. § 1391.

Defendant UA moves for summary judgment. On a motion for summary judgment, the entire record is considered with all reasonable inferences drawn in favor of the nonmovant and all factual disputes resolved in favor of the nonmovant. *Crawford v. Metro. Gov't of Nashville & Davidson Cnty., Tenn.*, 555 U.S. 271, 274 n.1 (2009); *Malen v. MTD Prods., Inc.*, 628 F.3d 296, 303 (7th Cir. 2010); *Stokes v. Bd. of Educ. of City of Chicago*, 599 F.3d 617, 619 (7th Cir. 2010). The burden of establishing a lack of any genuine issue of material fact rests on the movant. *Ponsetti v. GE Pension Plan*, 614 F.3d 684, 691 (7th Cir. 2010); *Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001). The nonmovant, however, must make a showing sufficient to establish any essential element for which she will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S.

317, 322 (1986); ***Montgomery v. Am. Airlines, Inc.***, 626 F.3d 382, 389 (7th Cir.

2010). The movant need not provide affidavits or deposition testimony showing

the nonexistence of such essential elements. ***Celotex***, 477 U.S. at 324; ***O'Brien v.***

***Encotech Constr.***, 2004 WL 609798 *1 (N.D. Ill. March 23, 2004). Also, it is not

sufficient to show evidence of purportedly disputed facts if those facts are not

plausible in light of the entire record. *See* ***Lorillard Tobacco Co. v. A & E Oil,***

***Inc.***, 503 F.3d 588, 594-95 (7th Cir. 2007); ***Yasak v. Ret. Bd. of Policemen's***

***Annuity & Benefit Fund of Chicago***, 357 F.3d 677, 679 (7th Cir. 2004);

***Lampley v. Mitcheff***, 2010 WL 4362826 *6 (N.D. Ind. Oct. 27, 2010). As the

Seventh Circuit has summarized:

> The party moving for summary judgment carries the
> initial burden of production to identify "those portions of the
> pleadings, depositions, answers to interrogatories, and
> admissions on file, together with the affidavits, if any, which it
> believes demonstrate the absence of a genuine issue of
> material fact." ***Logan v. Commercial Union Ins. Co.***, 96 F.3d
> 971, 978 (7th Cir. 1996) (citing ***Celotex Corp. v. Catrett***,
> 477 U.S. 317, 323, 106 S. Ct. 2548 (1986) (citation and
> internal quotation omitted)). The moving party may discharge
> this burden by "'showing--that is, pointing out to the district
> court--that there is an absence of evidence to support the
> nonmoving party's case." ***Celotex***, 477 U.S. at 325, 106 S. Ct.
> 2548. Once the moving party satisfies this burden, the
> nonmovant must "set forth specific facts showing that there is
> a genuine issue for trial." Fed. R. Civ. P. 56(e). "The
> nonmovant must do more, however, than demonstrate some

factual disagreement between the parties; the issue must be 'material.'" *Logan*, 96 F.3d at 978. "Irrelevant or unnecessary facts do not preclude summary judgment even when they are in dispute." *Id.* (citation omitted). In determining whether the nonmovant has identified a "material" issue of fact for trial, we are guided by the applicable substantive law; "[o]nly disputes that could affect the outcome of the suit under governing law will properly preclude the entry of summary judgment." *McGinn v. Burlington Northern R.R. Co.*, 102 F.3d 295, 298 (7th Cir. 1996) (citation omitted). Furthermore, a factual dispute is "genuine" for summary judgment purposes only when there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505 (1986). Hence, a "metaphysical doubt" regarding the existence of a genuine fact issue is not enough to stave off summary judgment, and "the nonmovant fails to demonstrate a genuine issue for trial 'where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party . . . .'" *Logan*, 96 F.3d at 978 (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348 (1986)).

*Outlaw*, 259 F.3d at 837.

Resolving all genuine factual disputes and drawing all reasonable inferences in plaintiff's favor, the following facts are assumed to be true for purposes of summary judgment. Plaintiff is a Muslim who was born in Bosnia and lived there until she was 11 years old. On June 13, 2008, she was hired by defendant to work in its Pain Center. The decision to hire plaintiff was made by

Dr. Olga Ivankovich, an Orthodox Christian who grew up in the part of Yugoslavia that is now Croatia.[1]

Dr. Olga was not in the Pain Center on a daily basis and left management to Renata Lukenda, plaintiff's immediate supervisor. Dr. Olga told all the medical assistants that orders from Lukenda were to be followed and treated as if said by Dr. Olga. Lukenda is Christian. Although there is a dispute about Lukenda's national origin, plaintiff states that Lukenda constantly made comments praising Croatia and criticizing Bosnia, thus evidencing that she self-identified as Croatian.[2]

On September 9, 2008, plaintiff asked to take off almost a month in vacation. She was going to Bosnia to visit her new husband's family and had scheduled the trip before taking the job. She did not tell UA that she was taking the time off to observe the Muslim holiday of Ramadan. UA approved the request, and plaintiff went to Bosnia from approximately September 11, 2008 through October 6, 2008.

---

[1]To avoid confusion, Dr Olga Ivankovich and Dr. Anthony Ivankovich, husband and wife, will be referred to by their first names.

[2]Defendant has argued that Lukenda, based on her passport, is Bosnian. With its reply brief, defendant filed a motion to strike raising several arguments, one of which is that part of plaintiff's evidence relating to Lukenda's national origin is hearsay. This evidence has not been considered.

After plaintiff returned from Bosnia in October 2008, she requested a day off to observe a Muslim holiday that was scheduled to occur in December 2008. Lukenda told plaintiff that the Muslim holiday was not a "real holiday" and she could not take the day off.

Plaintiff alleges that Lukenda and Dr. Olga made various workplace comments critical of Bosnia or Muslims. The comments are summarized below in the analysis of the hostile environment claim.

Plaintiff alleges that Lukenda constantly and unfairly criticized plaintiff about her work and told her that her mistakes were because she was Bosnian. One job of the medical assistants was to transfer information from patient charts to billing sheets to be sent to a billing company. According to plaintiff, it was routine for medical assistants to have sheets returned for clarification, but in plaintiff's case only, Lukenda would characterize these routine occurrences as mistakes.

On February 8, 2009, Lukenda sent a memo to Dr. Olga describing problems with plaintiff's work which included problems with billing sheets and failing to return phone calls to patients. On February 10, 2009, Dr. Olga placed plaintiff on a three-month probation and gave her a memo explaining the reasons. Dr. Olga physically threw the memo at plaintiff while yelling at her to get out of

her office. Sanja, a non-Muslim medical assistant, and Dorota, a non-Muslim/non-Bosnian medical assistant, also had billing corrections come back during this time, but neither were placed on probation or had a disciplinary memo thrown at them.

In June or July 2009, plaintiff reported to Pat McHale of the Human Resources Department that Lukenda and Dr. Olga were treating her unfairly and making comments about her being a Bosnian-Muslim. No action was taken after this discussion, and neither Lukenda or Dr. Olga changed their behavior.

In July 2009, plaintiff asked Lukenda whether she could take off for a Muslim holiday scheduled for September 21, 2009. Lukenda denied the request, telling plaintiff that Muslim holidays are not "real holidays" and that if she did not believe her, to call Dr. Olga who would confirm that she could not take the day off. When plaintiff called Dr. Olga, Dr. Anthony answered the phone. He was plaintiff's third-level supervisor. He granted the request, stating "that's fine, enjoy your holiday."

The incident that precipitated plaintiff's firing occurred in mid-September 2009. During the week of September 10th to 15th, plaintiff was the medical assistant designated in charge of the narcotics cabinet. In this role, she

was supposed to do an end-of-day count of the medicine in the cabinet and, along with a witness, sign the log book.

It does not appear that the missing vial led to any concrete harm, and no one ever accused plaintiff of taking the vial. At issue is whether the proper protocols were followed. According to plaintiff, on September 14, 2009, she noticed the missing vial while doing the count. Based on her training, which she received from Lukenda, plaintiff thought she should report the missing vial to Lukenda, her supervisor, but Lukenda had already left the Pain Center for the day. So plaintiff told her about it the next day, September 15, 2009. Lukenda told plaintiff not to worry and that she would investigate what happened. Discrepancies in the narcotics log had occurred in the past when physicians or residents would take narcotics without logging them. They were able to do so because Lukenda would leave the key in the cabinet, which was contrary to the written policy requiring that the key be kept on the person of the medical assistant. On this occasion, Lukenda specifically told plaintiff not to ask physicians or other staff members what may have happened and not to make any notations in the log.

On September 16, 2009, medical assistant Dorota Kobylak was responsible for the count and she noticed the missing vial and asked plaintiff about

it. Plaintiff told Kobylak that it was missing since yesterday and that she had to talk to Lukenda.

On September 17, 2009, Lukenda notified Dr. Anthony in writing about the incident. In her memo, Lukenda stated that she learned about the missing vial from KObylak on Wednesday September 16th and then asked plaintiff about it. Plaintiff gave three conflicting stories: "1. Resident asked her for Demerol but don't remember why and it was long time ago. 2. Maybe we used on a patient that we do not remember. 3. She was not 100% sure if she counted correct."

On September 22, 2009, Dr. Anthony called plaintiff to a meeting. He arranged for Pat McHale, from human resources, to be present. After the meeting, McHale wrote a "file note" summarizing what happened. The second paragraph of the five-paragraph note, which describes what happened, seems to be taken directly from Lukenda's September 17th memo. The note states the following about what was discussed in the meeting:

> In today's meeting, Dr. Ivankovich advised Aldijana of the seriousness of the situation regarding the missing Demerol and her lack of notification and documentation. She said in explanation that she had counted the narcotics on Friday, September 11 and noticed that there was just one vial of Demerol remaining. She made a mental note of this because it would be necessary for a new order to be placed as soon as possible to ensure that there was an adequate supply for the

following week.  On Monday, September 14, she again
counted the narcotics and saw that the Demerol was missing.
She said she did not report it then as Renata (clinic supervisor)
had already left for her nursing class but that she intended to
do so [the] next day.  She further indicated that the Surgicenter
had borrowed another medication on Friday and she thought
that they may also have requested the Demerol.  She admitted
she forgot to mention or document the missing narcotic on
Tuesday 9/15 and Wednesday, 9/16.

Dr. Anthony told plaintiff that not reporting a missing narcotic was extremely

serious and a major breach of the Pain Center regulations and that, combined with

her problems from February 2009, she could no longer work there.

Dr. Anthony alone made the decision to fire plaintiff.  He did not consult

with Dr. Olga, his wife, because he believed she would try to change his mind, as

she had always protected plaintiff.  He also did not consult with Lukenda, nor take

any other steps to investigate.

On January 14, 2010 plaintiff filed a discrimination charge with the

Illinois Department of Human Rights and the EEOC.  She alleged that she was

subjected to a hostile environment, that she was denied a request in October 2008

to take off for Ramadan, and that she was fired for discrimination because she

requested to take off on September 21, 2009 for a Muslim holiday.  On July 28,

2011, the EEOC gave plaintiff a right to sue letter.

In her complaint, plaintiff asserted three Title VII discrimination claims. Plaintiff voluntarily dismissed defendant Rush University Medical Center. Count III, a claim for retaliation, was previously dismissed with prejudice because the basis for this claim (the complaint to Pat McHale in July 2009) had not been included in plaintiff's EEOC charge.

Plaintiff has three remaining Title VII claims set forth in Counts I and II: defendant failed to accommodate her request to take off time for the religious holiday Ramadan; defendant subjected her to a hostile work environment; and defendant fired her based on a discriminatory animus.

The first claim does not survive summary judgment. Plaintiff, in her complaint, refers to defendant's alleged failure to accommodate "her religious observance of Ramadan in October of 2008." In its opening brief, defendant asserted that this claim was not viable because it is undisputed that plaintiff was in fact allowed to take off of work, approximately a month, during this time. In her statement of additional facts and in her response to defendant's statement of material facts, plaintiff includes facts relating to the October 2008 holiday plus facts relating to a later request to take off for a religious holiday in December 2008. In doing so, she seems to be switching her focus from the October 2008 holiday to

the December 2008 holiday. However, in her response brief, plaintiff does not present any argument as to either of these two religious holidays. Therefore, as defendant argues in its reply brief, this portion of her claim has been waived. In addition, defendant points out that her EEOC charge and complaint only mention the October 2008 holiday. The December 2008 holiday request would not be actionable for this additional reason as well.

Plaintiff's hostile environment claim likewise cannot survive summary judgment. Plaintiff's claim rests on the following statements and actions that took place over her 15-month employment:

>(1) Shortly after plaintiff was hired, Dr. Olga asked her if she was Bosnian-Muslim. When plaintiff said yes, Dr. Olga asked why she was Muslim when she had a last name that was Montenegrin/Serbian. Plaintiff told her she had always been raised a Muslim. Dr. Olga told plaintiff: "you need to research that; you were taken over by Turkish people back a long time ago. If you research you're going to find out that you're not a Muslim." (Pl. Dep. at 40.)
>
>(2) Three months later, Dr. Olga asked plaintiff if she "looked into [her] religion and where [her] family is coming from." (Pl. Dep. at 41.) When plaintiff said no, there was no further discussion.
>
>(3) After plaintiff returned from Bosnia in October 2008, she asked to take off a day to observe a Muslim holiday in December of 2008. Lukenda stated: "no, nobody's off on that day, everybody's working. It's not like it's Christmas, and we all get a day off. It's not a real holiday." (Pl. Dep. at 26.)

(4) A similar conversation with Lukenda took place in July 2009 when plaintiff asked off for a religious holiday on September 21, 2009.

(5) In August or September of 2008, plaintiff and Lukenda briefly spoke in Yugoslavian in front of a patient who then asked what language they were speaking.  Plaintiff said they both spoke the same language.  Lukenda stated: "it's not the same; I speak Croatian, you speak Bosnian.  We're not the same."  (Pl. Dep. at 64.)  A week later a similar exchange occurred in front of a patient.  Lukenda would constantly remind plaintiff that they did not speak the same language.

(6) A resident going on vacation to Bosnia and Croatia asked plaintiff and Lukenda which places she should visit. When plaintiff mentioned a few places in Bosnia, Lukenda said:  "Don't go to Bosnia; there's nothing to see there; you should just visit Croatia, it's beautiful."  (Pl. Dep. 17.)

(7) At a company Christmas party, Lukenda's brother came to pick her up.  Plaintiff stated that he was good-looking and they should try to get him a girlfriend.  Lukenda said: "make sure she's Croatian because we only date Croatian." (Pl. Dep. 169.)

(8) In the February 10, 2009 meeting, Dr. Olga threw a memo at plaintiff and yelled at her.

(9) A few months later, Dr. Olga told plaintiff that she had taken her off the streets and given her this job and that "[this] office is not Bosnia" so she cannot do whatever she wants.  (Pl. Dep. 123.)  Plaintiff responded that her being from Bosnia had nothing to do with her work employment and Dr. Olga told plaintiff not to talk back and that she had a big mouth.


Plaintiff alleges that the comments were made with an angry tone and demeanor and were intended to express animus towards Bosnians and Muslims.

She also alleges that she asked Lukenda to stop joking around.  She also complained to McHale in June or July 2009.

To avoid summary judgment, plaintiff must show that (I) the work environment was offensive both subjectively and objectively; (ii) the harassment was based on her membership in a protected class; (iii) the conduct was severe or pervasive; and (iv) there is a basis for employer liability.  ***Nichols v. Michigan City Plant Planning Dep't***, 755 F.3d 594, 600 (7th Cir. 2014).  In assessing whether the comments were severe or pervasive, this Court looks at the totality of the circumstances, including:  "(1) the frequency of the discriminatory conduct; (2) how offensive a reasonable person would deem it to be; (3) whether it is physically threatening or humiliating conduct as opposed to verbal abuse; (4) whether it unreasonably interferes with an employee's work performance; and (5) whether it was directed at the victim."  ***Id.*** at 601.

A trier of fact could not find that these statements collectively rose to the level the Seventh Circuit requires to make out a hostile-environment claim.  Accepting plaintiff's interpretation that the comments had an undercurrent of ill will to them and were not merely idle, innocuous banter, most of the comments were still made in a civil manner.  No epithets or explicitly insulting words were

used.  Plaintiff has likewise not suggested that the comments were protracted or persisted beyond a few brief statements in each instance.  For example, when Dr. Olga asked plaintiff if she had researched her heritage to see if she was really Muslim and plaintiff responded that she had not, Dr. Olga did not further question plaintiff.  Many of the comments were triggered by third parties, such as a resident or patient, asking a question.  Lukenda's comment about her brother wanting to date a Croatian likewise arose out of plaintiff's initial statements about getting him a boyfriend.  With one exception, none of the comments were accompanied by any physical gestures or intimidation.  The only instance fitting in this category is the allegation that Dr. Olga threw the disciplinary memo at plaintiff, but in this case Dr. Olga made no comment related to plaintiff's religion or national origin.

In sum, although the comments may be relied on as evidence of a discriminatory animus, they are not enough to demonstrate the type of "hellish" environment the Seventh Circuit has repeatedly held is required to survive summary judgment.  *See, e.g.*, **Nichols**, 755 F.3d at 601-02 (six alleged incidents of racial harassment in a two and half week period were not enough to avoid summary judgment because other factors, such as lack of physical threats, weighed against a finding of a hostile environment); ***Scruggs v. Garst Seed Co.***, 587 F.3d

832, 841 (7th Cir. 2009) ("occasional inappropriate comments, including that [plaintiff] was 'made for the back seat of a car' and looked like a 'dyke'" were not enough to support a hostile environment claim); *Whittaker v. N. Ill. Univ.*, 424 F.3d 640, 645-646 (7th Cir.2005) (affirming summary judgment for employer because workplace comments were "relatively isolated" and were less offensive than comments in other cases); *Luckie v. Ameritech Corp.*, 389 F.3d 708, 714 (7th Cir. 2004) ("The conduct in question consists of isolated events that were not physically threatening or humiliating and in some cases were not even directed at Luckie.").

The third claim for discriminatory firing is the one both plaintiff and defendant focus their briefs on. Plaintiff proceeds under both the direct and indirect methods. *See Langenbach v. Wal-Mart Stores, Inc.*, __ F.3d __, 2014 WL 3805439 *6-7 (7th Cir. Aug. 4, 2014). Under the indirect burden-shifting method, plaintiff must first make out a *prima facie* case by showing: "(1) the employee is a member of a protected class, (2) she was meeting the employer's legitimate expectations, (3) she suffered an adverse employment action, and (4) similarly situated employees outside of the protected class were treated more favorably." *Id.* at *6.

Plaintiff cannot proceed under this method because she has not identified a similarly situated employee. "To satisfy this requirement, a plaintiff must identify at least one employee who is directly comparable to her in all material respects." *Perez v. Thorntons, Inc.*, 731 F.3d 699, 704 (7th Cir. 2013). One reason for this requirement is that "differing roles, performance histories, or decisionmaking personnel" may explain the differential treatment. *Id.* (quoting *Coleman v. Donahoe*, 667 F.3d 835, 846 (7th Cir. 2012)). The comparison need not be identical in "every conceivable way." *Perez*, 731 F.3d at 704. Instead, the court should conduct a "common-sense examination." *Id.*

Here, because the defendant claims to have fired plaintiff both for her February billing mistakes and for the September Demerol incident, she must point to an employee outside the protected class who engaged in roughly similar conduct yet was not fired. Although plaintiff mentions other medical assistants with billing mistakes, none of them were involved in the Demerol incident or one similar. Plaintiff does argue that Lukenda both had billing problems in February and was also involved in the Demerol incident, but Lukenda is not similarly situated for several reasons. First, she was plaintiff's supervisor who had been working at the company for six years before plaintiff was hired. She occupied a different role

(supervisor) than plaintiff, even though she did some of the same work. Second, plaintiff has not provided evidence that Lukenda had billing mistakes in February 2009 or, if she did, that these mistakes rose to the same level as plaintiff's. Third, as for the Demerol incident, there is no evidence that anyone specifically told Dr. Anthony about the violations she allegedly committed. Plaintiff's theory is that Lukenda manipulated things so that Dr. Anthony was kept in the dark and believed plaintiff was solely at fault.

Next to be considered is whether plaintiff can rely on the direct method. Under this method, plaintiff may rely on either direct or circumstantial evidence. She has no direct evidence. ***Mullin v. Temco Mach.***, 732 F.3d 772, 776 (7th Cir. 2013) ("Direct evidence requires that the employer admit its discriminatory intent (*e.g.*, the 'smoking gun' case)."). Instead, she offers circumstantial evidence from which the trier of fact can infer intentional discrimination. ***Id.*** Circumstantial evidence typically falls into three categories:

> The first includes "suspicious timing, ambiguous statements oral or written, and other bits and pieces from which an inference of retaliatory intent might be drawn." ***Cloe v. City of Indianapolis***, 712 F.3d 1171, 1180 (7th Cir. 2013) (quotation omitted). The second is "evidence, but not necessarily rigorous statistical evidence, that similarly situated employees were treated differently." ***Id.*** And the third is

> "evidence that the employer offered a pretextual reason for an
> adverse employment action." *Id.*

*Perez*, 731 F.3d at 711.

Plaintiff is relying on a cat's paw theory because she has no evidence that the decisionmaker, Dr. Anthony, was motivated by discriminatory bias. He never made any comments about Bosnians or Muslims. He did not work directly with plaintiff. Plaintiff's theory is that Lukenda, and also perhaps Dr. Olga, had the requisite discriminatory animus. Under the cat's paw theory, plaintiff may base her claim on their discriminatory animus if they in turn were a causal factor in the decision by, for example, providing factual information that affected Dr. Anthony's decision. *Smith v. Bray*, 681 F.3d 888, 900 (7th Cir. 2012). However, "the chain of causation can be broken if the unbiased decisionmaker conducts a meaningful and independent investigation of the information being supplied by the biased employee." *Schandelmeier-Bartels v. Chicago Park Dist.*, 634 F.3d 372, 383 (7th Cir. 2011).

Here, there is no doubt that Lukenda provided input that affected Dr. Anthony's decision. In fact, other than his conversation with plaintiff, Lukenda's memo is the only piece of evidence he relied on. By itself, this memo led to the

calling of a meeting five days later, a meeting in which plaintiff was fired on the spot. McHale's memo describing this meeting adopts the basic description of the Demerol incident from Lukenda's memo. Dr. Anthony conducted no independent investigation. He did not talk to Lukenda or his wife, even though they were the ones who worked closely with plaintiff. He also did not talk to any other staff who may have had knowledge about the missing Demerol.

Defendant argues that plaintiff, in the September 22 meeting, refused to offer any explanation when confronted about the incident. Defendant seems to be suggesting that she effectively admitted through silence that she did something wrong. This argument is not strong enough to grant summary judgment because it rests on ambiguous facts. McHale in her contemporaneous memo states that plaintiff did offer an explanation, although it was one that Dr. Anthony found unconvincing. The ambiguity appears to have arisen from the fact that plaintiff at one point in her deposition stated that she did not offer any explanation during the meeting. However, later during the same line of questioning, when asked about the accuracy of statements in the McHale memo, plaintiff stated that she did offer some explanation. This factual uncertainty is for the trier of fact to sort out.

The next step in the analysis is to assess whether Lukenda's memo about the Demerol incident was accurate. Defendant asserts that it was an unbiased description of what happened. Plaintiff strongly disputes this assertion. Numerous factual disputes exists about what went on and who was at fault. There are really only two witnesses: plaintiff and Lukenda. They provide starkly different interpretations of what happened.

The court need not sort through these factual contentions because, for purposes of summary judgment, plaintiff's version of events must be credited. Accepting this version, a trier of fact could conclude that Lukenda's memo was not simply inaccurate, but was a deliberate effort to frame plaintiff and falsely accuse of her of not doing her job properly. This could be evidence of both animus and pretext.

Similarly, there is a factual dispute regarding whether plaintiff deserved the three-month probation in February 2009. Plaintiff claims that, although she did make mistakes, they were no worse than the other medical assistants, none of whom were put on probation. Although defendant admits that all the medical assistants made mistakes, it asserts that plaintiff's mistakes were more pronounced. Defendant also asserts that plaintiff has no evidence that her mistakes were the

same as others. Defendant questions whether plaintiff was in a position to judge how well others were performing and asserts that she is relying on the hearsay statements of co-workers. However, in her deposition, plaintiff said that she not only talked to her co-workers but that she at one point compared her mistakes to those of another medical assistant. This testimony suggests she did have at least some direct observations. Whether these observations are credible and sufficient is an issue for the jury to assess.[3]

The final issue is whether plaintiff has evidence that Lukenda's (alleged) plan to get plaintiff fired was motivated by a discriminatory animus towards Bosnians or Muslims, rather than by some other motive such as self-interest in covering up her own mistakes in the Demerol incident.

To establish this point, plaintiff relies primarily on the allegedly discriminatory workplace comments discussed above. While a trier of fact could find that these were idle comments with no malice to them, the trier of fact also could reasonably infer from them that Lukenda had a discriminatory bias. Plaintiff has asserted that they were made with an angry tone and that some of the

---

[3]In its motion to strike, defendant sought to strike hearsay statements about what these other medical assistants told plaintiff about their own mistakes. As noted above, this Court has not relied on those hearsay statements.

comments persisted even after plaintiff told Lukenda she found them objectionable. Although the comments could be interpreted as mere statements of opinion, a trier of fact also could conclude that they collectively reflect an underlying ill will towards plaintiff's religion and national origin.

Defendant points out the comments were not made contemporaneously with her termination and that they were thus not sufficiently "connected to the decision" to fire her. *Perez*, 731 F.3d at 709. This argument ignores plaintiff's theory that the (alleged) vendetta to oust her began at least as early as February 2009 when she was put on probation. Several comments were contemporaneous with this decision.

To summarize, plaintiff is relying on the quick decision to fire her, made without any investigation or corroboration, which in turn was based on intentionally false statements of her work performance, combined with ongoing workplace comments directed at her religion and nationality. This is sufficient to survive summary judgment.

IT IS THEREFORE ORDERED that defendant's motion to strike [#56] is granted in part and denied in part.  Defendant's motion for summary judgment [#35] is granted in part and denied in part.  All claims are dismissed except the claim that plaintiff was discharged based on discrimination.  This case is set for a status hearing on October 9, 2014 at 2:00 p.m. in order to fix the date for presentation of a proposed final pretrial order.

ENTER:

_____
UNITED STATES DISTRICT JUDGE

DATED:  SEPTEMBER  18, 2014